**In re BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION.**

**This Document Relates to:
All ERISA Actions.**

**Master File No. 09 MD 2058(PKC).**

United States District Court,
S.D. New York.

Aug. 27, 2010.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge:

This is a putative class action for damages and injunctive relief brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, *et seq.* Plaintiffs are participants in four plans covered by ERISA: the Bank of America 401(k) Plan (the "BofA 401(k) Plan"), the Bank of America 401(k) Plan for Legacy Companies (the "Legacy Plan"), the Countrywide 401(k) Plan (the "Countrywide Plan"), and the Bank of America Pension Plan, (the "Pension Plan") (collectively referred to as the "Plans").

Plaintiffs allege that defendants were fiduciaries of the Plans and that, from January 11, 2008 through January 21, 2009 (the "Class Period"), defendants breached various fiduciary duties they owed to the Plans in violation of ERISA. (*See* Consolidated Amended Complaint (the "Complaint") ¶ 5.) Principally, plaintiffs allege that defendants allowed the imprudent investment of 401(k) plan assets in Bank of America ("BofA" or the "Company") stock, failed to eliminate the Company Stock Option, a fund invested primarily in BofA stock, as an investment choice for the 401(k) and Countrywide Plans and offered BofA stock as an investment measure for Pension Plan participants. Plaintiffs allege that such actions were imprudent because defendants knew or should have known that BofA had recently engaged in several acquisitions that compromised the Company, including the acquisitions of Countrywide Financial Corporation ("Countrywide") and Merrill Lynch & Co., Inc. ("Merrill"). In addition, plaintiffs allege that defendants failed to disclose the risks that BofA shareholders would assume as a result of these acquisitions. According to plaintiffs, these actions transformed the character of BofA stock, making it an imprudent investment. Plaintiffs also assert claims for failure to monitor, claiming that defendants failed to remove fiduciaries who breached their duties of loyalty and prudence by investing in BofA stock and continuing to offer

Plan Participants the option of investing in the Common Stock Fund.

Plaintiffs filed the Complaint on October 9, 2009. (Docket No. 35.) Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted.

For reasons more fully explained, defendants' motion is granted. Plaintiffs have failed to adequately and plausibly allege that defendants, other than the Benefits Committee, acted as fiduciaries, that the decision to allow the Company Stock Fund to remain as an investment option for the 401(k) Plans, as required by the Plan documents, and as an investment measure for the Pension Plan, was imprudent, that defendants breached a fiduciary duty to monitor the appointed trustees and administrators of the Plans or that defendants breached a fiduciary duty by failing to disclose material information to Plan Participants. The Complaint, viewed in the light most favorable to plaintiffs, does not plausibly allege that the Benefits Committee breached its duty of prudence when it followed Plan documents and continued to offer the Company Stock Fund as an investment option for Plan Participants. Because the Complaint does not plausibly allege a breach of the duty of prudence or loyalty, it also fails to plausibly allege a breach of the duty to monitor. Furthermore, the Complaint fails to plausibly allege a breach of the duty to disclose. Because the Complaint fails to plausibly allege a claim for breach of fiduciary duty, the claims based on a theory of co-fiduciary liability are also dismissed.

### I. *Procedural History*

Multiple actions relating to the claims asserted in the Complaint were filed against the defendants in various districts. Upon BofA's application, the Judicial Panel on Multidistrict Litigation consolidated the related actions for coordinated pretrial purposes and, on June 11, 2009 assigned them to the Honorable Denny Chin pursuant to 28 U.S.C. § 1407. The Complaint was filed on October 9, 2009. (Docket No. 35) Upon Judge Chin's elevation to the Second Circuit, the consolidated action was reassigned to the undersigned on April 28, 2010. (Docket No. 250.) Defendants now move to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. (Docket No. 119.)

For the purposes of this motion, the allegations set forth in the Complaint are accepted as true, with the exception of legal conclusions couched as factual allegations. *See Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). All reasonable inferences are drawn in the plaintiffs' favor as the non-movants. *United States v. City of New York,* 359 F.3d 83, 91 (2d Cir.2004). Certain materials, including the Plan documents, are properly considered on the motion because, as will be explained, they are incorporated by reference into the Complaint.

### II. *The Parties.*

Plaintiffs are individuals who are "participants" in the BofA 401(k) Plan, the Legacy 401(k) Plan, the Countrywide 401(k) Plan or the Pension Plan (the "Plan Participants"). (Compl. ¶ 27–33, 162.)

Defendant BofA is a Delaware corporation with headquarters in North Carolina. (*Id.* ¶ 35.) BofA "provides a diverse range of banking and non-banking financial services and products domestically and internationally." (*Id.*)

The Bank of America Corporation Corporate Benefits Committee (the "Benefits Committee") is the administrator for each Plan. (*Id.* ¶ 36.) The Complaint names as defendants individuals who served as

members of the Benefits Committee during the Class Period: J. Steele Alphin, Amy Woods Brinkley, Barbara J. Desoer, Liam E. McGee, Timothy J. Mayopoulos, Brian T. Moynihan, Bruce L. Hammonds, and Richard K. Struthers. (*Id.* ¶¶ 37–45.)

The Bank of America Compensation and Benefits Committee (the "Compensation Committee") is a committee composed of members of BofA's board of directors. (*Id.* ¶ 46.) The Compensation Committee "provid[es] overall guidance with respect to the establishment, maintenance and administration of [BofA's] compensation programs and employee benefits plans." (*Id.* ¶ 47.) The Compensation Committee also had the authority to delegate its discretionary duties and responsibilities with respect to the adoption, amendment, modification or termination of benefit plans. (*Id.* ¶ 49.) The Complaint names individuals who served as members of the Compensation Committee during the Class Period as defendants: O. Temple Sloan, Jr., Thomas M. Ryan, Patricia Mitchell, and Meredith R. Spangler. (*Id.* ¶ 51.)

The Complaint also names as defendants the other individual BofA directors during the Class Period. (*Id.* ¶ 52.) The board defendants include the individuals who were members of the Compensation Committee, as well as individuals Kenneth D. Lewis, Jackie M. Ward, Thomas May, Walter E, Massey, Charles Gifford, William Barnet III, John Collins, Robert Tillman, Frank Bramble, Sr., Monica Lozano, Tommy Franks, and Gary Countryman. (*Id.* ¶ 55.)

Defendant Kenneth Lewis ("Lewis") was Chairman of the board of directors from February 2005 until 2009. (*Id.* ¶ 55(a).) Lewis has been President of BofA since July 2004 and Chief Executive Officer ("CEO") since April 2001. (*Id.*)

### III. *Jurisdiction*

Federal question jurisdiction is properly invoked because plaintiffs' claims arise under ERISA, 29 U.S.C. § 1132, *et seq.* 28 U.S.C. § 1331.

### IV. *This Action*

Plaintiffs claim that defendants BofA and the Benefits Committee (together, the "Prudence Defendants") breached their fiduciaries duties of loyalty and prudence to the Plans by continuing to offer the Company Stock Option as an investment choice to Plan Participants when they knew, or should have known, that the Company Stock Option was no longer a prudent investment (Counts I and V). Plaintiffs also assert claims against defendants BofA, the Compensation Committee, and the board (the "Monitoring Defendants") for failure to monitor the Prudence Defendants, which plaintiffs allege enabled the breach of the duties of prudence and loyalty (Counts II and VI). Plaintiffs further claim that defendants BofA, the Benefits Committee, and Lewis, (the "Communications Defendants") breached their fiduciary duties by failing to provide "complete and accurate information" to Plan Participants (Counts III and VII), Finally, plaintiffs assert claims for breach of fiduciary duty against all defendants on a theory of co-fiduciary liability (Counts IV and VIII).

### V. *Background*

The facts below are taken from the Complaint. Non-conclusory factual allegations are taken as true for purposes of this motion. *See Iqbal,* 129 S.Ct. at 1949–50.

Plaintiffs claim that as a result of ill-conceived acquisitions and business decisions, BofA, which was once "perceived as a 'financial stalwart,' with diverse and safe income streams, [became] a repository for some of the most toxic assets ever assem-

bled," causing a "devastating impact" on the value of BofA stock. (Compl. ¶ 235.)

In 2005, BofA acquired MBNA, the country's largest credit card issuer at the time. (*Id.* ¶ 178.) As a result of the acquisition, BofA's consumer and small business division grew and accounted for 48% of BofA's net income. (*Id.* ¶ 179.) Approximately two years later, on October 1, 2007, BofA acquired LaSalle Bank ("LaSalle"). (*Id.* ¶ 180.) LaSalle was a Midwestern commercial bank that was "heavily invested in the consumer credit and housing credit markets." (*Id.*)

In 2007, as a global credit crisis began to unfold, "[s]everal major mortgage lenders disclosed extraordinary loan default rates." (*Id.* ¶ 182.) Between April 2007 and January 2008, several subprime lenders filed for bankruptcy, including New Century Financial Corporation on April 2, 2007 and American Home Mortgage in August 2007. (*Id.* ¶ 182.) Countrywide, "the nation's largest mortgage lender and home loan service provider," (*id.* ¶ 236), "narrowly avoided bankruptcy with $13 billion in emergency loans" (*id.* ¶ 182). On August 21, 2007, BofA invested $2 billion in Countrywide. (*Id.* ¶ 222.)

The value of mortgage securities "plunged from the third quarter of 2007 through mid-2008." (*Id.* ¶ 184.) BofA reported in its September 2007 10–Q that it was exposed to over $12.1 billion in credit derivative obligations backed by subprime residential mortgages. (*Id.* ¶ 185.)

As the credit market continued to decline, BofA reported additional losses. "By the end of 2007, as a result of several ill-timed acquisitions, [BofA] found itself with a heavy and dangerous exposure to the quickly deteriorating consumer and housing credit markets . . . ." (*Id.* ¶ 177.) BofA's Chief Financial Officer, Joe Price, informed investors that BofA "expect[ed] a meaningful impact on global corporate and investment banking's third quarter results." (*Id.* ¶ 187.) On October 18, 2007, BofA announced that its third quarter earnings per share declined 31% to 82 cents and BofA reported that it had increased its provision for credit losses as a result of the weak housing market. (*Id.* ¶¶ 188–89.)

On January 22, 2008, BofA reported that its net income for 2007 declined 29% and earnings per share dropped 28%. (*Id.* ¶ 192.) The poor results from LaSalle contributed to the fourth quarter decline. (*Id.*)

As a result, BofA's increased exposure to risks in the credit market stemming from its acquisition of "failed banks and toxic assets," (*id.* ¶¶ 186–213), "even before the ill-fated decision to acquire Countrywide at the start of the Class Period, [caused BofA to be] severely compromised" (*id.* ¶ 214). Despite this compromised position, "[d]efendants painted a misleadingly rosy picture of the Company, its condition and its prospects." (*Id.* ¶ 215.) Plaintiffs cite statements in the 2007 Annual Report in support of this allegation. (*Id.* ¶¶ 216–218.)

BofA decided to acquire Countrywide on January 11, 2008. (*Id.* ¶ 225.) One day before BofA made the acquisition public, Countrywide "disclosed that 7.2 percent of the loans in its servicing portfolio were delinquent in December of 200[7]." (*Id.* ¶ 226.) The Complaint alleges that "the Countrywide acquisition greatly increased [BofA]'s sensitivity to what [BofA] should have known would be a prolonged housing market downturn." (*Id.* ¶ 229.) This was especially true, according to the Complaint, because the Countrywide acquisition "exacerbated" BofA's exposure to the deteriorating California and Florida residential mortgages. (*See id.* ¶¶ 230–233.) BofA "knew of [Countrywide's] exposure

[to impaired subprime and Option ARM loans], but failed to, in any meaningful way, manage the risk it presented to [BofA] and to the Plans' huge exposure to Company stock." (*Id.* ¶ 262.)

Furthermore, Countrywide's problematic accounting "masked the extent of its problems." (*Id.* ¶¶ 264–308.) In 2008, reports from other financial institutions predicted that BofA would face write-downs in the coming months and expressed concerns about BofA's portfolios. (*See id.* ¶¶ 311–15.) Countrywide's financial health continued to deteriorate throughout 2008. (*See id.* ¶¶ 317–20.) Although there was speculation that the acquisition might be in danger, Lewis reaffirmed BofA's commitment to the deal in June 2008. (*Id.* ¶¶ 320–21.) "Also in June of 2008, equity analysts at Standard and Poors slashed their rating of [BofA] stock to 'sell' on fears that [BofA] underestimated the impact of rising consumer defaults and delinquencies at Countrywide...." (*Id.* ¶ 323.)

On or about June 24, 2008, Countrywide shareholders approved the deal, which closed on or about July 1, 2008. (*Id.* ¶ 324.) Plaintiffs complain that "[d]espite the precarious state of Countrywide's assets, and the evidence concerning Countrywide's unethical and improper practices of which [BofA] must have been aware as a result of its due diligence, [BofA] purchased the biggest seller of toxic and risky mortgage products and raved about the benefits of the acquisition." (*Id.* ¶ 328.)

Plaintiffs allege that defendants made misleading statements to shareholders about the Countrywide acquisition. (*Id.* ¶¶ 326–35.) Specifically, the Complaint points to Lewis's statement in the January 2008 Form 8–K that "Countrywide presents a rare opportunity for [BofA] to add what we believe is the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier

lender to consumers [because] ... home ownership is a fundamental pillar of the U.S. economy and over time it will be a key area of growth for [BofA]." (*Id.* ¶ 329.) Lewis also made statements about BofA's market position and stated that the "Countrywide acquisition will create a leading position in home financing." (*Id.*)

Following the Countrywide acquisition, BofA's net income "declined substantially," yet Lewis "promised" in the April 21, 2008 Form 8–K filing "that [BofA] was in a 'strong position to withstand the jolts to the system.'" (*Id.* ¶ 331.) Lewis also stated that BofA's "earnings power from our core business activities is strong and growing.... We are bringing innovative new products to market, taking market share and expanding customer relationships across the company." (*Id.* ¶ 332.) Despite Lewis's optimistic views, BofA's earnings continued to fall and its credit quality "weakened substantially." (*Id.* ¶ 333.) Nevertheless, Lewis continued to make public statements touting the benefits of the Countrywide acquisition. (*Id.* ¶¶ 333–34.)

On September 15, 2008, approximately two months after the Countrywide acquisition, BofA publicly announced its intention to acquire Merrill. (*Id.* ¶¶ 339, 355.) The Complaint alleges that the collapse of Bear Sterns in March 2008, and then Lehman Brothers just days before the announcement of the Merrill acquisition, affected the value of Merrill, given the similarities in the investment banks' exposures. (*Id.* ¶¶ 342–45.) The stock price for Merrill dropped approximately 24% during the week ending on September 12, 2008, three days before the Merrill acquisition was announced. (*Id.* ¶¶ 345, 355.)

BofA offered $29 per share to purchase Merrill even though the most recent closing price had fallen to $12.59. (*Id.* ¶¶ 345, 353–54.) BofA's stock price fell approxi-

mately 21.3% after news of the acquisition became public. (*Id.* ¶ 363.) Merrill later reported a net loss of $5.1 billion for the third quarter of 2008. (*Id.* ¶ 370.)

BofA's stock price continued to decline. On October 6, 2008, BofA announced its third quarter 2008 results, which included a cut to quarterly dividends, plans to raise $10 billion in new capital, an increase in the level of nonperforming assets, and a provision for credit card losses of $6.45 billion. (*Id.* ¶¶ 389–90.) At the same time, BofA also announced that it had agreed to an $8.4 billion settlement of predatory lending claims against Countrywide. (*Id.* ¶ 387.) In light of the news, BofA stock fell 26% to $23.77 per share. (*Id.* ¶ 391.)

On November 3, 2008, BofA filed a proxy statement purporting to disclose the terms of the Merrill acquisition. (*Id.* ¶ 379.) The Complaint alleges that the proxy statement contained misrepresentations and omitted material information, including that BofA authorized Merrill to award bonuses to its employees in an amount up to $5.8 billion. (*Id.* ¶ 417–25.) Those alleged misrepresentations and omissions are the subject of related securities and derivative actions. (*See* Docket Nos. 29, 39.)

According to the Complaint, BofA considered, on several occasions, whether it should invoke the material adverse event clause of the acquisition agreement based on the material losses Merrill was suffering. (*See* Compl. ¶ 415.) Despite its knowledge of Merrill's financial information, BofA decided to proceed with the acquisition. (*See id.* ¶¶ 409–13.) At a special meeting held on or about December 5, 2008, 82% of BofA shareholders voted and approved the acquisition of Merrill. (*Id.* ¶ 405.)

BofA's acquisition of Merrill closed on January 1, 2009. (*Id.* ¶ 429.) BofA's stock price fell further after it released a press statement on January 16, 2009 announcing a fourth-quarter loss of $1.7 billion and reported that Merrill had a fourth-quarter loss of $15.3 billion, (*id.* ¶ 432.), and detailing federal capital support, which included $20 billion in cash and a $118 billion guarantee on loans BofA held. (*Id.* ¶¶ 431–35.) BofA also disclosed that it had "informed the federal government in mid-December that, without billions in additional aid, [BofA] would be unable to consummate the acquisition." (*Id.* ¶ 438.) At that time, BofA announced that it would cut quarterly dividends from 32 cents per share to a 1 cent per share in order to raise capital. (*Id.* ¶ 433.) BofA's stock price fell to $10.20 on January 14, 2009 and then to $6.68 on January 21, 2009. (*Id.* ¶¶ 82, 447–48.)

## A. *The Plans*

### I. *Bank of America 401(k) Plan*

It is undisputed that the BofA 401(k) Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and is a "defined contribution plan" within the meaning of § 3(34) of ERISA, 29 U.S.C. § 1002(34). Under ERISA, the BofA 401(k) Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). Claims of breach of fiduciary duty under ERISA are not asserted against or on behalf of the Plan itself; instead, the relief sought is for the benefit of the 401(k) Plan and its participants and beneficiaries. *See* ERISA § 409, 29 U.S.C. § 1109.

Under ERISA, the assets of employee benefits plans, including the Plans at issue here, must be "held in trust by one or more trustees." ERISA § 403, 29 U.S.C. § 1103(a). The assets of the 401(k) Plan are held in a trust fund administered by Bank of America, N.A. (Compl. ¶ 60.) The 401(k) Plan's stated purpose is "to provide a program through which Participants may

achieve additional financial security during their working years and in retirement and participate in the growth of the Participating Employers through ownership of Common Stock" in the Company. (*Id.* ¶ 61.) Under the Plan, "Participating Employers" include the Company and its Subsidiaries, and "Covered Employees" include any U.S.-based person who is identified as an Employee in the personnel records of his or her Participating Employer. (*Id.* ¶ 62.)

The 401(k) Plan has two components: the Employee Stock Ownership Plan (the "ESOP") and the "Profit-sharing portion." (*Id.* ¶ 63.) The ESOP includes the Common Stock Fund and the "Profit-sharing portion" is defined as "the portion of the Plan that is not the ESOP." (*Id.*) The Complaint states that the 401(k) Plan provides that the "ESOP assets shall include the Common Stock Fund. . . ." (*Id.* ¶ 64.) The Common Stock Fund is a "Fund that invests primarily in Common Stock" of BofA. (*Id.* ¶ 65; see 401(k) Plan at 2.1(c)(15) at 6.)

Throughout the Class Period, the 401(k) Plan offered 26 investment alternatives to Plan Participants, including, among others, the Common Stock Fund, the Stable Capital Fund, and 14 mutual funds. (Compl. ¶ 66.) The Common Stock Fund invested "all or nearly all" of its assets in BofA stock throughout the Class Period. (*Id.* ¶ 67.) The Summary Plan Description ("SPD") is a document summarizing the Plans, their various terms and the available investment options. ERISA requires plan administrators to distribute the information contained in the SPD to Plan Participants. With respect to the Common Stock Fund, the SPD states that "[u]nder normal circumstances [the fund] invests primarily in common stock of Bank of America Corporation, and also invests in short-term investments." (*Id.* ¶ 70.)

The 401(k) Plan gives "complete responsibility for the operation and administration of the Plan . . . excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee, or the Board of Directors" to the Benefits Committee. (Compl. ¶ 71; 401(k) Plan § 8.2(a) at 52.) The Plan delegates to the Benefits Committee all of the general "powers necessary to enable it to properly carry out its duties under the Plan and Trust" as well as specific powers and duties to:

(i) construe and interpret the Plan and to determine all questions that arise thereunder;

(ii) decide all questions relating to the eligibility of employees to participate in the Plan as well as to receive benefits under the Plan;

(iii) establish rules and procedures relating to Participant elections under the Plan, including Compensation reduction elections under Article IV, Distribution elections under Article VII and investment elections under Article XII, and the Committee in its discretion may employ one or more persons or entities to provide advice or other assistance to Participants in making their said investment elections;

. . .

(v) authorize all disbursements by the Trustee except for the ordinary expenses of administration of the Trust

. . .

(ix) modify or supplement any Plan accounting method, practice or procedure, make any adjustments to Accounts or modify or supplement any other aspect of the operation or administration of the Plan in such manner and to such extent consistent with and permitted by [ERISA] and the [Tax] Code that the Committee deems necessary or appropriate to correct errors and mistakes, to

effect proper and equitable Account adjustments or otherwise to ensure the proper and appropriate administration and operation of the Plan; and

(x) carry out such other and further specific duties, and exercise such other and further specific powers authority and discretion, as are elsewhere in the Plan or the Trust either expressly or by necessary implication conferred upon it.

(Compl. ¶ 72; 401(k) Plan § 9.3, at 55–56.)

The Benefits Committee is responsible for prescribing rules and procedures and is specifically given the discretion to

[p]rescribe restrictions as to time, frequency and amount of permitted investment changes. Such restrictions may include, without limitation, rules that limit or otherwise restrict transfer to or from some or all of the Funds to particular Valuation Date(s) during particular period(s) of time, including rules that in the Committee's judgment are appropriate to deter, restrict, or eliminate transfers to, from or among Funds by Participants that because of frequency, timing or amount may be to the direct or indirect detriment of other Participants or the Plan, and such rules may include the imposition of redemption or similar fees on transfers from particular Fund. Such restriction may include, without limitation, restrictions regarding transfers to or from a Fund whose investments are not highly liquid.

(Compl. ¶ 73; 401(k) Plan § 12.1(b)(v).)

a. *Contributions to the 401(k) Plans*

Each 401(k) Plan Participant has an individual account that is credited with Employer and Participant-directed contributions and earnings, expenses, gains and losses. (Compl. ¶ 74.) All Covered Employees are eligible to make contributions as soon as they are employed by a Participating Employer. (*Id.* ¶ 75.) During the Class Period, Plan Participants were permitted to contribute between 1% and 30% of their compensation, up to the annual maximum permitted under the Internal Revenue Code. (*Id.* ¶ 76.) BofA provides a matching contribution for all employees who have completed 12 months of service. (*Id.* ¶ 77.) "Plan Participants are authorized to direct the investment of their contributions and the Company Matching Contributions among the various options in the 401(k) Plan." (*Id.* ¶ 79.) "If a participant does not initially direct his or her investment, the participant's contribution [is] invested in the Stable Capital Fund or if not in existence, a fund the Committee determines to pose the least risk to principal." (*Id.* ¶ 80.)

b. *Losses to the 401(k) Plan*

As of December 31, 2007, the 401(k) Plan held about 75 million shares of BofA common stock, which at that time had a market value of approximately $3 billion and amounted to about 31.5% of the total assets of the 401(k) Plan. (Compl. ¶ 81.) As of December 31, 2008, the 401(k) Plan held over 81 million shares of BofA stock, which had a market value of approximately $1.15 billion and constituted approximately 19% of the total assets of the 401(k) Plan. (*Id.*)

II. *The BofA 401(k) Plan for Legacy Companies*

The Legacy 401(k) Plan Participating Employers include BofA and its principal subsidiaries. (Compl. ¶ 85.) The Legacy Plan's participants include current and former employees of certain acquired companies, such as MBNA and Fleet Bank. (*Id.* ¶ 86.) During the Class Period, the Legacy Plan provided participants with 26 investment options, including, among others, the BofA Common Stock Fund and 14 mutual funds. (*Id.* ¶ 88.)

#### a. Contributions to the 401(k) Legacy Plan

The employee contribution rules and the contribution matching policy for the Legacy 401(k) Plan are similar to those for the 401(k) Plan. *See supra* V(A)(I)(a); (Compl. ¶ 87).

#### b. Losses to the 401(k) Legacy Plan

As of December 31, 2007, the Legacy 401(k) Plan held approximately 20 million shares of BofA common stock, which had a market value of approximately $845 million. (Compl. ¶ 90.) At that time, BofA common stock accounted for approximately 18% of the Legacy 401(k) Plan's total assets. (Id.) One year later, the Legacy 401(k) Plan held almost 25 million shares of BofA common stock, which had a market value of approximately $351 million and constituted about 10% of the Legacy 401(k) Plan's total assets. (*Id.*)

### III. Countrywide 401(k) Plan

BofA acquired Countrywide and it became a wholly-owned subsidiary of BofA on July 1, 2008. (Compl. ¶ 92.) The Countrywide 401(k) Plan covers eligible employees of Countrywide as of the date of the acquisition. (*Id.* ¶ 95.) On July 1, 2008, Countrywide common stock was converted into BofA shares at a rate of .1822 BofA shares for each share of Countrywide common stock. (*Id.* ¶ 96.) The Countrywide 401(k) Plan's investment options include 19 mutual funds, a money market mutual fund and an employer common stock fund. (*Id.* ¶ 97.)

#### a. Contributions to the Countrywide 401(k) Plan

Eligible employees could contribute up to 40% of their pretax annual compensation to the Countrywide 401(k) Plan. (*Id.* ¶ 98.) The employer matching contributions for the Countrywide 401(k) Plan were governed by a different scheme than the other 401(k) plans. Countrywide made quarterly, discretionary matching contributions equal to 50% of the first six percent of eligible participant contributions. (*Id.* ¶ 99.) Before April 1, 2008, Countrywide's discretionary matching contributions were made entirely in Countrywide common stock and plan participants had the option of re-directing the contributions. (*Id.*) The value of Countrywide common stock was based on the closing price for the last business day of the quarter for which the contributions were made. (*Id.*) As of April 1, 2008, Countrywide made the matching contributions in cash and directed the contributions to the same investment choices as the pre-tax contributions. (*Id.*)

#### b. Losses to the Countrywide 401(k) Plan

As of December 31, 2007, the Countrywide 401(k) Plan held shares of Countrywide common stock with a market value of approximately $83 million, which constituted approximately 9% of Countrywide 401(k) Plan's total assets. (*Id.* ¶ 102.) As discussed above, Countrywide common stock was converted to BofA stock on July 1, 2008. As of December 31, 2008, the Countrywide 401(k) Plan held shares of BofA stock with a market value of approximately $40 million, which was approximately 7% of its total assets. (*Id.*) The Complaint alleges that the significant decrease in the value of the BofA stock led to a loss in value of the Countrywide 401(k) Plan. (*Id.* ¶ 103.)

### IV. The BofA Pension Plan

The Pension Plan is a cash balance "defined benefit" plan within the meaning of ERISA. *See* ERISA § 3(35), 29 U.S.C. § 1002(35); (Compl. ¶ 104). The Pension Plan maintains a hypothetical account in the name of each participant. (Compl. ¶¶ 104–05.) The individual accounts re-

ceive compensation credits at the end of each pay period, and Pension Plan participants select investment choices for their accounts. (*Id.* ¶ 105.) Unlike the 401(k) Plans, the individual Pension Plan account is not actually invested in Plan Participants' investment choices. The investments are hypothetical in that the amount Plan Participants direct to each investment choice is credited with the same return that would be received if the account were actually invested in the investment choice. (*Id.* ¶ 110.)

### a. *Contributions to the Pension Plan*

The Pension Plan is funded solely by BofA contributions. (*Id.* ¶ 114.)

### b. *Losses to the Pension Plan*

The Complaint alleges that "[t]o the extent that the actual investment return on Pension Plan assets exceeded the return on the Investment Measures selected by participants, the difference is an arbitrage gain for [BofA]" and those gains "are used to offset contributions [BofA] would otherwise be required to make to the Pension Plan to fund benefit payments." (*Id.* ¶ 115.) Plaintiffs allege that "to the extent [BofA] stock underperformed [in] the vehicles in which Pension Plan assets were actually invested, [BofA] benefits" and this is an "inherent conflict of interest" for fiduciaries. (*Id.* ¶ 116.)

Plaintiffs do not seek redress for losses to the Pension Plan as a whole, but rather a recalculation of their individual benefits. Indeed, the Complaint, viewed most favorably, does not allege a loss to the Pension Plan. Plaintiffs allege that the Pension Plan may have received an "arbitrage gain." (Compl. ¶ 115.)

### V. *Standard Governing a Motion to Dismiss*

Rule 8(a)(2), Fed.R.Civ.P., requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (ellipsis in original). In *Twombly,* the Supreme Court held that in order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide the grounds upon which the claims rest, through factual allegations sufficient to raise a right to relief above the speculative level. 550 U.S. at 555, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, as "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1949–50.

The Supreme Court has described the motion to dismiss standard as encompassing a "two-pronged approach" that requires a court first to construe a complaint's allegations as true, while not bound to accept the veracity of a legal conclusion couched as a factual allegation. *Id.* Second, a court must then consider whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

■ Although the Court is limited to facts as stated in the complaint, it may consider "any written instrument attached

to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). "Where the plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). Here, the Complaint incorporates the Plan documents, the SPD, and various corporate SEC filings by reference and they are appropriately considered on this motion. *See ATSI,* 493 F.3d at 87.

### VI. *Discussion*

■ ERISA was enacted "to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). It is designed to protect employee benefit and pension plans by, among other things, "setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans." *Varity Corp. v. Howe,* 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The fiduciary duties imposed under ERISA are derived from the common law of trusts. *Id.* The written instrument governing an employee benefit or pension plan, known as the plan agreement, describes the plan and names one or more fiduciaries who are responsible for making discretionary decisions on behalf of the plan. *See* 29 U.S.C. § 1102. An employer, as plan sponsor, is similar to the settlor in the trust context in that it does not act in a fiduciary capacity with respect to its decisions regarding the

plan design, or its decisions to "adopt, modify, or terminate" the ERISA plan. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 443, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).

■ ERISA imposes fiduciary duties on plan administrators and managers. *See Varity,* 516 U.S. at 496, 116 S.Ct. 1065 (ERISA "set[s] forth certain general fiduciary duties."); 29 U.S.C. § 1104(a)(1) (describing ERISA duties of prudence, loyalty, and diversification of investments). Fiduciaries are defined under ERISA to include those named in the plan documents as fiduciaries as well as anyone who functions as a fiduciary by means of exercising control and authority over the plan. *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Under ERISA, a person functions as "a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). In this respect, "Congress intended ERISA's definition of fiduciary to be broadly construed." *See LoPresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir.1997).

If a fiduciary breaches one or more duties, he "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate...." 29 U.S.C. § 1109(a). Defendants argue that the Complaint, construed in the light most favorable to plaintiffs, fails to establish that

the defendants were functioning as fiduciaries with respect to the actions at issue.

## A. *Fiduciary Status*

A threshold question is whether each defendant acted as a plan fiduciary. *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). An individual may be an ERISA fiduciary for one purpose, but is not necessarily a fiduciary for other purposes. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir.2002). As discussed above, ERISA imposes fiduciary duties upon individuals to the extent that they act with discretionary authority and control over the plan.

### I. *Named Fiduciary*

The Benefits Committee is the administrator and named fiduciary for the Plans. *See* ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) (every ERISA plan must have one or more named fiduciaries); ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A); (Compl. ¶¶ 137, 144, 148, 151). The Plans give the Benefits Committee "complete responsibility for the operation and administration of the Plan ... excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors." (Compl. ¶ 138.) It is undisputed that the Benefits Committee is a Plan fiduciary.

The Complaint does not allege that any other defendants are named fiduciaries, but claims that the remaining defendants were *de facto* fiduciaries by virtue of their actions with respect to the Plan and the Plan Participants.

### II. *De Facto Fiduciary Status*

#### a. *BofA*

Actions that BofA took as plan sponsor, such as the acts of creating the Plans and the selection of their terms, were not taken in a fiduciary capacity. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). Furthermore, BofA's status as an employer, including its ability to terminate the employment of members of the Benefits Committee is, alone, insufficient to render BofA an ERISA fiduciary. *See Crocco v. Xerox Corp.*, 137 F.3d 105, 107 (2d Cir.1998).

Viewed in the light most favorable to plaintiffs, the Complaint does not plausibly allege that BofA exercised authority over the administration of the Plans. *See* 29 U.S.C. § 1002(21)(A). The allegation that "[o]n information and belief BofA "execute[d] the Trust documents with the Trustee to provide for the investment, management, and control of the assets of the Plans" is not supported by any factual allegations. (*See* Compl. ¶ 128.) As such, it is insufficient to state a plausible claim for relief. *See Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

Plaintiffs also claim that BofA is liable as an ERISA fiduciary based on the doctrine of *respondeat superior*. (*See* Compl. ¶ 131) (BofA exercised authority and control over the activities of its employees and directors). There is a split of authority regarding whether the doctrine of *respondeat superior* provides an independently viable theory of recovery in the ERISA context. *Compare Bannistor v. Ullman*, 287 F.3d 394, 408 (5th Cir.2002) ("[N]on-fiduciary *respondeat superior* liability attache[s] under ERISA only when the principal 'actively and knowingly' participated in the agent's breach.") *with Hamilton v. Carell*, 243 F.3d 992, 1001–02 (6th Cir.2001) (rejecting the Fifth Circuit's "actively and knowingly" requirement and noting that "[a]lthough some courts have recognized that *respondeat superior* liability may apply in cases arising under

ERISA alleging breach of fiduciary duties, this area of the law has been muddled by the fact that many of those courts consistently have confused *respondeat superior* liability with direct liability.").

Although the Second Circuit has not spoken on this issue, several district courts in this circuit have declined to apply *respondeat superior* in the ERISA context as an independent theory of liability. *See In re Morgan Stanley ERISA Litig.*, 696 F.Supp.2d 345, 355 (S.D.N.Y.2009) ("[F]iduciary responsibility ... based on a *respondeat superior* theory is not established in view of the split of authority over whether ERISA provides for such a cause of action."); *Harris v. Finch, Pruyn & Co., Inc.*, 2008 WL 2064972, at *7 (N.D.N.Y. May 13, 2008) ("*Respondeat superior* liability does not exist under ERISA's fiduciary liability scheme."); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2005 WL 563166, at *4 n. 5 (S.D.N.Y.2005) (holding that ERISA does not contain a provision which "permits a non-fiduciary to be held liable for breaches of fiduciary duties by others").

Courts that have recognized claims based on a theory of *respondeat superior* tend to require factual allegations that support a claim that the corporation exercised de *facto* control over ERISA fiduciary employees. *See, e.g., Bannistor*, 287 F.3d at 408 (requiring *de facto* control and "active and knowing" participation in the breach for liability to attach to the employer); *Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society*, 841 F.2d 658, 665 (5th Cir. 1988) (The employer "never actively and knowingly participated in [the employee's] breach of duty to the Fund, as is required for a finding of *respondeat superior* liability."); *Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.*, 234 F.Supp.2d 222, 228 (W.D.N.Y.2002) (rejecting *respondeat*

*superior* theory where there were no factual allegations to support a claim that the employer exercised *de facto* control).

The Complaint, in a conclusory fashion, alleges that BofA, "at all applicable times, on information and belief, has exercised control over the activities of its employees and directors that performed fiduciary functions with respect to the Plans, including the Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. [BofA] is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability." (Compl. ¶ 131.) Here, the Complaint, viewed most favorably, does not plausibly allege facts to support the conclusory allegation that BofA, as employer, exercised authority and control over plan fiduciaries such that it qualifies as a *de facto* fiduciary under ERISA.

Finally, the Complaint alleges that BofA was a Plan fiduciary because the Plans gave BofA the responsibility to appoint the Trustee, and by virtue thereof, the duty to monitor and remove the Trustee as necessary. (*Id.* ¶ 128.) The Complaint alleges, on information and belief, that BofA "had the responsibility to execute the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plans." (*Id.*) Furthermore, the Complaint alleges, on information and belief, that BofA "exercised *de facto* authority and control with respect to the *de jure* responsibilities of the Committee Defendants," (*Id.* ¶ 129.) The Complaint does not allege facts that support the conclusory allegation that BofA exercised *de facto* authority and control over the Committee Defendants.

█ The Complaint also alleges that BofA exercised discretionary control and authority in a fiduciary capacity by communicating with Plan Participants regard-

ing the Plans by, together with the Benefits Committee, disseminating the Plans' documents and related materials, which incorporated by reference BofA's SEC filings. (*Id.* ¶ 130.) Plaintiffs claim that the reference to BofA's SEC filings converted all such materials into fiduciary communications and assert that because these statements were made by BofA, BofA communicated with Plan Participants as a fiduciary. (*See id.* ¶ 130.) As described below, *see infra,* III, communications made by a company in SEC filings do not become fiduciary statements for ERISA plans unless they are *"intentionally* connected ... to statements ... about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." *Varity,* 516 U.S. at 505, 116 S.Ct. 1065 (emphasis in original).

The Complaint, construed most favorably, does not sufficiently allege that BofA intentionally connected statements made in SEC filings about the company's financial condition and, specifically, benefits of the Countrywide and Merrill acquisitions, to the future of plan benefits. The Complaint, therefore, fails to allege that BofA acted in a fiduciary capacity when it made the allegedly misleading statements in its SEC filings.

### b. *BofA Board of Directors*

 The Complaint names the BofA board of directors as defendants because BofA, "as a corporation, cannot act except through its human counterparts." (Compl. ¶ 157.) The Complaint alleges that because individuals serving on the board "exercised discretionary authority or discretionary control respecting the management of the Plans, exercised authority or control respecting the management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the plans," they

were *de facto* fiduciaries under ERISA. (*Id.* ¶¶ 158–161.) The Complaint does not contain factual allegations regarding any actions taken by the board to add support to the conclusory assertion that the board was a fiduciary with respect to the management of the Plans' assets or administration of the Plans. Therefore, the Complaint does not allege that the individuals comprising the board of directors were plan fiduciaries with respect to the management of the Plans' assets.

 The board had the authority to appoint and/or remove members of the Benefits Committee and the Compensation Committee. (*Id.* ¶ 159.) Plaintiffs allege that this ability gave rise to the duty to monitor the members of the Benefits Committee and the Compensation Committee. (*Id.* ¶ 160.) To the extent that the ability to appoint members gave rise to a duty to monitor, *see infra* at IV, the Complaint asserts that the members of the board of directors were acting as plan fiduciaries with respect to their alleged failure to monitor the appointees.

### c. *Defendant Lewis*

The Complaint alleges that Lewis, as a member of the board of directors, participated in the appointment of members of the Benefits Committee. (Compl. ¶ 134.) Plaintiffs assert that Lewis's status as a member of the board imposed a duty upon him to monitor the activities of the Benefits Committee and to ensure that the Committee was fully informed of all information needed to perform its duties under ERISA. (*Id.*)

 The Complaint also alleges that Lewis breached a fiduciary duty to Plan Participants when he made "numerous ... incomplete and inaccurate" statements to Plan Participants regarding the status of BofA and its future prospects. (*Id.* ¶ 135.)

According to the Complaint, Lewis made the statements "via internal 'talking points' disseminated to employee Plan Participants." (*Id.*) The Complaint alleges that the statements "were made in an ERISA fiduciary capacity because they contained information about the likely future of the Plans' benefits, in particular the value and prudence of [an investment in BofA stock]." (*Id.*) The Complaint further alleges that "Lewis made these statements knowing that, due to his position as CEO, employees would view him as a fully informed, knowledgeable, and trustworthy source of information regarding [BofA's] financial condition and future prospects." (*Id.*)

The Complaint fails to plausibly allege that Lewis made the purported statements in a fiduciary capacity in relation to Plan Participants. In essence, the Complaint alleges that defendant Lewis made certain statements in his role as CEO, and that because such statements reflected his views on the financial condition of BofA, Plan Participants relied on that information. Plaintiffs claim that this reliance made the statements fiduciary communications. "The flaw in this argument, however, is that there is no basis for the assumption that [Lewis] acted in an ERISA fiduciary capacity when making these statements. [His] limited Plan responsibilities did not include communicating with participants." *See In re Lehman Sec. & ERISA Litig.*, 683 F.Supp.2d 294, 300 (S.D.N.Y.2010). Furthermore, under plaintiffs' theory, any communication by a company regarding its financial condition could become an ERISA fiduciary communication.

#### d. *The Compensation and Benefits Committee*

 The Compensation Committee "has responsibility for substantially all of [BofA's] employee benefit plans." (*Id.*

¶ 154.) The Compensation Committee has the ability to delegate its authority, including its responsibilities for "the adoption, amendment, modification, or termination of benefit plans and ... the awards of stock options." (*Id.* ¶ 155.) The Complaint, generously construed, does not contain factual allegations with respect to actions by the Compensation Committee to support its conclusory allegation that the Compensation Committee was a fiduciary in that it "exercised discretionary authority or discretionary control respecting the management of the Plans, exercised authority or control respecting management of disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the plans." (*Id.* ¶ 156.)

### B. *Fiduciary Duties*

 ERISA imposes upon fiduciaries "a number of detailed duties and responsibilities, which include the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Mertens,* 508 U.S. at 262, 113 S.Ct. 2063 (internal quotations and citations omitted) (alteration in original). ERISA is a "comprehensive and reticulated statute" which statutorily defines these duties. *Id.* at 251, 113 S.Ct. 2063. An ERISA fiduciary has a duty of loyalty, which requires that he "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). An ERISA fiduciary also has a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like char-

acter and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" various ERISA provisions. 29 U.S.C. § 1104(a)(1)(D). ERISA also requires that fiduciaries diversify the investments of the plan in order to minimize the risk of large losses, but this duty does not apply to plans that qualify as "eligible individual account plans" ("EIAPs") or employee stock ownership plans ("ESOPs"). 29 U.S.C. §§ 1104(a)(1)(C), 1104(a)(2), 1107(d)(3)(A). For EIAPs and ESOPs, "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities." 29 U.S.C. § 1104(a)(2); *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir.2004).

■ To state a claim for breach of fiduciary duty, a complaint must allege that (1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty. *See* 29 U.S.C. § 1109. As discussed, *supra*, the Complaint does not plausibly allege the fiduciary status of any defendant other than the Benefits Committee and, to the extent that a duty to monitor claim exists, BofA and the board of directors. There can, therefore, be no breach of fiduciary claim against the remaining defendants because they are not alleged to be Plan fiduciaries. Furthermore, even if there were allegations sufficient to convey *de facto* fiduciary status upon defendants, the Complaint fails to allege breach of any fiduciary duty.

## I. *Duty of Prudence*

ERISA imposes a duty on plan fiduciaries to manage plan assets with prudence.

29 U.S.C. § 1104(a)(1)(B). Count I alleges that the Prudence Defendants breached their duties of prudence and loyalty by offering BofA stock as an investment option for participant contributions and by continuing to make and maintain investment in BofA stock. (Compl. ¶¶ 468–487.)

As explained above, an individual acts as a fiduciary to the extent that he or she has discretion over the plan function in question. *See* 29 U.S.C. § 1002(21)(A); *Pegram*, 530 U.S. at 225–26, 120 S.Ct. 2143; *Harris Trust*, 302 F.3d at 28. The defendants argue that although the Benefits Committee is a named Plan fiduciary, it was not acting in a fiduciary capacity when it continued to offer the Company Stock Fund as an investment option because the Plan documents themselves required that the Company Stock Fund be offered, thereby depriving the Benefits Committee of the authority to remove it from the list of possible investments. Defendants argue that because the Benefits Committee lacked authority or discretion to remove the Company Stock Option, it did not act in a fiduciary capacity. Defendants argue that the failure to remove the Company Stock Option is conduct immune from judicial review because the defendants lawfully followed plan requirements. *See Harris Trust*, 302 F.3d at 29 ("[A]dherence to [plan] terms by a plan administrator cannot constitute a breach of its fiduciary duties, barring a grant of discretionary authority to the fiduciary"); *but see* ERISA 29 U.S.C. § 1104(a)(1)(D) (plan fiduciaries are required to follow plan documents only "insofar as such documents and provisions are consistent with the provisions" of ERISA).

Defendants support their argument that they lacked discretion or authority to remove the BofA Common Stock Fund from the list of available investment options by

pointing to sections 11.1(b) and 11(d) in the Plan documents. Section 11.1(b) states that:

> The Funds *shall* include the Common Stock Fund. This fund *shall* be invested primarily in [BofA] Common Stock. The Common Stock Fund may also be invested in such cash or cash equivalent investments and other types of investments, as the Committee determines is appropriate to provide liquidity for cash benefit payments and transfers, the payments of administrative expenses, and such Fund's other expected cash requirements.

(Declaration of Rodman K. Forter in Support of Defendants' Motion to Dismiss ("Forter Decl.") Ex. 2 at 58 (emphasis added).) Section 11.1(d) indicates an expectation that the Common Stock Fund would always be one of the many investment options available:

> From time to time after the Restatement Date, the Committee in its discretion may increase or decrease the number of Funds *other than the Common Stock Fund,* and in such regard may direct the Trustee to add or terminate specific Funds or modify existing Funds.

(*Id.* at 59 (emphasis added).) Also, section 11.2 describes the intended investments of the ESOP:

> The assets of the ESOP shall be invested primarily in Common Stock. In such regard, the ESOP assets shall include the Common Stock Fund in its entirety. ESOP assets may also be invested, directly or indirectly, in cash or cash equivalent investments and other types of investments *pending use to purchase Common Stock.*

(*Id.* at 61 (emphasis added).)

In support of their claims that defendants should have, in the exercise of prudence, removed the Company Stock Fund from the list of available investment options and discontinued investment in BofA stock, plaintiffs point to sections 8.2(a) and 12.1(b)(v), which outline the Benefits Committee's responsibilities. Section 8.2(a) states:

> The Committee shall be the general administrator of the Plan and shall have complete responsibility for the operation and administration of the Plan, including those powers and duties set forth in Section 9.3, but excluding those areas of responsibility specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors.

(*Id.* at 52.) Section 12.1(b)(v) states:

> The Committee may prescribe restrictions as to the time, frequency and amount of permitted investment changes. Such restrictions may include, without limitation, rules that limit or otherwise restrict transfers to or from some or all of the Funds to particular Valuation Date(s) during particular period(s) of time, including rules that in the Committee's judgment are appropriate to deter, restrict or eliminate transfers to, from or among Funds by Participants that because of frequency, timing or amount may be to the direct or indirect detriment of other Participants or the Plan, and such rules may include the imposition of redemption or similar fees on transfers from particular Fund. Such restrictions may include, without limitation, restrictions regarding transfers to or from a Fund whose investments are not highly liquid.

(*Id.* at 66–67.)

█ Broad plan language must yield to specific contractual provisions. *See Aramony v. United Way of Am.,* 254 F.3d 403, 413 (2d Cir.2001); *see also Kirschbaum v. Reliant Energy, Inc.,* 526 F.3d 243, 250 (5th Cir.2008) (holding that general plan

language did not make investment in employer stock merely permissible where specific plan provisions required that such an option be offered). The Plan gave the Benefits Committee discretion to prescribe rules governing Plan Participants' investment selections but the provision does not override other specific provisions requiring that the Common Stock Fund be available for Plan Participants' investments.

Plaintiffs argue that even if the Plan documents indicate an intention that the Common Stock Fund must remain an available investment option, plan fiduciaries were bound by the duty of prudence to override such provisions to the extent that they required fiduciaries to take an objectively imprudent action.

The Second Circuit has not determined whether there are circumstances in which a fiduciary is required to override plan terms. For instance, it has not addressed a situation in which plan terms require the fiduciary to offer employer stock that would otherwise be considered an imprudent investment. District courts have split on the issue. *Compare In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *14 (S.D.N.Y. Aug. 31, 2009) (holding that there is no duty to override a plan's mandate that company stock be offered as an investment option) *with Gearren v. McGraw–Hill Cos., Inc.*, 690 F.Supp.2d 254, 264 (S.D.N.Y.2010) ("[A] plan agreement cannot extinguish the fiduciary status of a named fiduciary simply by commanding him to take certain actions.").

As I next explain, I need not reach the issue of whether defendants' decision to continue offering the Company Stock Option is immune from judicial review because, given the presumption of prudence that applies to the decision to invest ESOP or EIAP assets in company stock, the Complaint fails to plausibly allege facts that the defendants' decision was impru-

dent. The allegations in this respect are conclusory.

### a. *Presumption of Prudence*

The Third Circuit has held that a plan fiduciary who invests in company stock for an ESOP is "entitled to a presumption that [the fiduciary] acted consistently with ERISA by virtue of that decision." *See Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir.1995) The Second Circuit has not addressed whether plan fiduciaries in the ESOP and EIAP context are entitled to a presumption of prudence, but other courts in this district have adopted the *Moench* presumption. *See, e.g., In re Lehman Bros.*, 683 F.Supp.2d at 301; *In re Citigroup*, 2009 WL 2762708, at *16; *In re Avon Prods., Inc., Sec. Litig.*, 2009 WL 848083, at *11 (S.D.N.Y. Mar. 3, 2009); *In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 474 (S.D.N.Y.2005); *In re WorldCom, Inc.*, 263 F.Supp.2d 745, 764 (S.D.N.Y. 2003).

Important to the Third Circuit's holding in *Moench* was the nature and purpose of ESOPs, which are "designed to invest primarily in qualifying employer securities." *See Moench*, 62 F.3d at 568; 29 U.S.C. § 1107(d)(6)(A). Congress has "enacted a number of laws designed to encourage employers to set up such plans." *Id.* (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir.1983)). In contrast to the Congressional policy of promoting employee stock ownership through ESOPs, Congress has also expressed a strong policy in the ERISA context of safeguarding the interests of employee plan participants by imposing fiduciary duties on plan administrators, including the duty of prudence. *See id.* at 569. "[W]hen the plaintiff claims that an ESOP fiduciary violated its ERISA duties by continuing to invest in employer securities, the conflict becomes particularly stark." *Id.*

After careful consideration of the intent of Congress, as well as guidance from the law of trusts and the practical implications of the possible outcomes, the Third Circuit held that "an ESOP fiduciary who invests the assets in employer stock is entitled to the presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities." *Id.* at 571.

Plaintiffs argue that the *Moench* presumption should not be adopted, but even if potentially applicable, it should not be applied at the pleading stage. Recent decisions in this district, relying upon *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, have held that the *Moench* presumption is an appropriate consideration on a motion to dismiss. *See Fisher v. J.P. Morgan Chase & Co.*, 703 F.Supp.2d 374, 383–84 (S.D.N.Y.2010); *Gearren*, 690 F.Supp.2d at 269–70; *In re Lehman Bros.*, 683 F.Supp.2d at 301–02; *In re Citigroup*, 2009 WL 2762708, at *17. As explained above, in *Twombly*, the Supreme Court held that plaintiffs are required to plead facts sufficient to raise the right to relief above the speculative level. 550 U.S. at 555, 127 S.Ct. 1955. Where plaintiff fails to plead facts which, when construed most favorably, would establish that defendants breached their duty of prudence, notwithstanding the *Moench* presumption, the court should dismiss the complaint pursuant to Rule 12(b)(6). See *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 (3d Cir.2007). The *Moench* presumption has been adopted by Judges in this district,[1] and I adopt it here. Because plaintiffs claim for breach of the

duty of prudence cannot succeed absent facts that would allow the actions taken to overcome the presumption of prudence, it is appropriate to consider the Complaint in light of the *Moench* presumption. *See Avaya*, 503 F.3d at 349.

In order to overcome the *Moench* presumption, plaintiffs must allege that "the fiduciary abused its discretion." *Moench*, 62 F.3d at 571. The pleading must allege that the fiduciary had knowledge at a pertinent time of "an imminent corporate collapse or other 'dire situation' sufficient to compel an ESOP sell-off." *In re Lehman Bros.*, 683 F.Supp.2d at 301 (citing *In re Avon Prods.*, 2009 WL 848083, at *11). This may be demonstrated by allegations "that the ERISA fiduciary could not have believed reasonably that continued adherence to the [plan's terms] was in keeping with the settlor's expectations of how a prudent trustee would operate." *Wright*, 360 F.3d at 1097 (citing *Moench*, 62 F.3d at 571).

The *Moench* court suggested that allegations of a "precipitous decline" in the price of employer stock and a fiduciary's "knowledge of [the company's] impending collapse" would be sufficient to overcome the presumption of prudence attached to decisions to continue ESOP investments in employer stock. 62 F.3d at 572. In *Moench*, a "precipitous decline" was shown where the stock lost 98% of its value over a two-year period, declining from $18.25 to less than $0.25 per share. *Id.* at 557. The plaintiffs there also alleged an "impending collapse" where "federal regulators informed the company's Board of Directors that they had concerns about the company's financial condition and had uncovered

---

1. *See Fisher*, 703 F.Supp.2d at 383–84; *Gearren*, 690 F.Supp.2d at 269; *In re Lehman Bros.*, 683 F.Supp.2d at 301; *In re Morgan Stanley*, 696 F.Supp.2d 345, 358–59; *In re Citigroup*, 2009 WL 2762708, at *16; *In re* *Avon Prods.*, 2009 WL 848083, at *11 (R & R of MHD, adopted by LAK); *In re Polaroid*, 362 F.Supp.2d at 474; *In re WorldCom*, 263 F.Supp.2d at 764.

various regulatory violations, the Federal Deposit Insurance Corporation eventually took over control of one of the company's subsidiaries; and, ultimately, the company filed for Chapter 11 bankruptcy." *Avaya*, 503 F.3d at 348 (summarizing *Moench*, 62 F.3d at 557, and holding that the facts before it alleging a drop in stock price of over 20% did not create "the type of dire situation which would require defendants to disobey the terms of the Plans").

■■■ Here, the Complaint alleges that the BofA's stock price declined approximately 83% during the Class Period. (Compl. ¶ 82 (stock price declined from approximately $38 to $6.68).) Courts have held that similar drops in stock price, alone, are insufficient to overcome the presumption of prudence. *See Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir.1995) (80% drop insufficient); *Crowley*, 234 F.Supp.2d at 227 (80% drop insufficient); *see also Wright*, 360 F.3d at 1098–99 (73% drop insufficient).

The Complaint makes numerous allegations regarding the financial status of Countrywide, Merrill, and BofA before and during the acquisitions in July and September 2008. The Complaint alleges that BofA should have known the potential risks of adding Countrywide's "toxic assets" to BofA's portfolio. The Complaint, in essence, alleges that the Countrywide acquisition and subsequent Merrill acquisition were poor business decisions that caused increased market skepticism of BofA, leading to a substantial decrease in share price. However, this ERISA action does not turn on whether BofA's decisions to acquire Countrywide and Merrill were good business judgments. Under ERISA, the question is whether the fiduciaries' decision to continue offering the Common Stock Fund as an investment option and to continue the Plans' investment in BofA stock, in light of plan language requiring that the Company Stock Option be available to Plan Participants as an optional investment measure, was a breach of their fiduciary duties.

The Complaint alleges that defendants should have known that BofA's acquisitions of Countrywide and Merrill would cause the price of BofA stock to drop. Plaintiffs contend that the potential decline in stock value rendered it imprudent for plan fiduciaries to allow the Company Stock Option to remain an investment option and for BofA to continue investing in BofA common stock.

As other courts have noted, if plan fiduciaries were required to sell employer stock in the event of a decline, plan fiduciaries would be placed in the untenable position of facing litigation in the event that the price of company stock rises after the plans sell off the assets. *See Kirschbaum*, 526 F.3d at 256; *Moench*, 62 F.3d at 571–72 ("[C]ourts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive."); *see also Tatum v. R.J. Reynolds Tobacco Co.*, 392 F.3d 636, 639–40 (4th Cir.2004) (allowing a claim for liquidating company stock following a 60% decline to proceed because the stock "rebounded sharply" months after the sale).

Although a decline in stock value of over 80% may have caused reason for concern about the level of risk involved with continued investment in BofA common stock, it cannot be said that the Company was in "imminent danger of collapse." Plaintiffs have not pleaded facts sufficient to establish that Plan fiduciaries should have known that BofA was on the brink of an "imminent collapse" such that a reasonable fiduciary could not have believed that continued investment in BofA stock was no

longer in accordance with the settlor's intent.

The 83% decline in stock value must be viewed in the context of the global financial crisis. Although the stock price significantly dropped during the Class Period, BofA stock retained a value of at least $5.10 per share. (*See* Compl. ¶ 447.) Indeed, in BofA's 2008 10–K, it reported net income of $4 billion for 2008 and had over $1.8 trillion in assets and approximately $177 billion in shareholder equity.[2] *See* Forter Deck, Ex. 24 (BofA 2008 10–K).

Because the Complaint does not contain facts sufficient to allege that plan fiduciaries breached their fiduciary duty of prudence in light of the presumption of prudence that attaches to investments of ESOP assets in employer stock, as required by Plan documents, the Complaint fails to state a claim for breach of the duty of prudence.

## II. *Duty of Loyalty*

The Complaint alleges that defendants breached the duty of loyalty because:

"the compensation and tenure of the Prudence Defendants was tied to the performance of [BofA] stock and/or other publicly reported financial performance of [BofA].... The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investment in [BofA stock], failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made [BofA] stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to [BofA]'s inappropriate practices; and by otherwise placing their own and [BofA]'s interests above the interests of the participants with respect to the Plans' investment in [BofA] stock.

(Compl. ¶¶ 481–82.)

A "conflict-of-interest claim" that is "based purely on the fact that Defendants' compensation was stock-based ... fails to state a claim for breach of fiduciary duty." *In re Citigroup*, 2009 WL 2762708, at *26 (citing *Polaroid*, 362 F.Supp.2d at 479 and *WorldCom*, 263 F.Supp.2d at 768). This is because the purported conflict would exist for all corporate insiders, who are charged with managing the affairs of the corporation; it would deprive the plans of services of the most knowledgeable individuals. Because the allegations in the Complaint are that defendants' compensation was tied to the performance of BofA stock, the Complaint does not plausibly allege a claim for breach of the duty of loyalty. *See id.*

To the extent that the Complaint asserts a claim for breach of the duty of loyalty

---

**2.** Although not material to my conclusion, I note that BofA's stock price has increased in the time following the Class Period. *See* Forter Decl., Ex. 10 (BofA stock price increased 145% from January 21, 2009 until December 4, 2009). This fact is demonstrative of the danger that plan fiduciaries might face if they are forced to decide whether to override the terms set forth in plan documents and divest the plan of company stock in the event of significant stock price declines. *See Kirschbaum*, 526 F.3d at 256 (noting that a plan fiduciary would be required to "predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded."); *see also In re Citigroup*, 2009 WL 2762708 at *13 (same).

under a theory that the duty of loyalty "require[s] [a fiduciary] to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries," the Complaint fails to state a claim because, as explained above, the Complaint does not allege a breach of the duty of prudence. (*See* Compl. ¶ 484.)

### III. *Disclosure Claims*

 ERISA fiduciaries have a duty to disclose negative information about plan benefits to beneficiaries if they know, or should have known, that failure to make such a disclosure would cause harm. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir.2001) ("When a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries."). There is not, however, an unlimited duty of disclosure. *See Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir.1997) (noting that because ERISA contains a comprehensive list of documents and information that plan fiduciaries are required to provide to plan participants, it would be "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure"); *see also Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (describing ERISA's comprehensive list of documents and information that plan fiduciaries are required to provide). Therefore, plan fiduciaries are not required to disclose "all documents that would be useful to plan participants." *Weinstein*, 107 F.3d at 146.

Other courts in this district have followed this reasoning and concluded that ERISA does not impose a duty upon plan fiduciaries to disclose nonpublic information that might affect the value of company stock. *See Fisher*, 703 F.Supp.2d at 386–87; *In re Citigroup*, 2009 WL 2762708, at *20–22. Although courts have held that there is an affirmative duty to disclose information when a plan fiduciary knows "that silence might be harmful" in cases involving failure to disclose information about plan benefits, plaintiffs do not provide support for their assertion that there is a duty to provide information about plan investments. *See Gearren*, 690 F.Supp.2d at 271–72 (distinguishing between the obligation to disclose "information about plan benefits" and a fiduciary obligation to disclose "information about the financial status of plan investments" and holding that that latter duty "finds no basis in the statutory language [of ERISA] and is inconsistent with the Second Circuit's reasoning in *Board of Trustees v. Weinstein*"); *In re Citigroup*, 2009 WL 2762708, at *21.

The terms of each Plan and the various investment options available are set forth in the SPD that was provided to each Participant, as required by ERISA. *See* 29 U.S.C. § 1021. The Plans offered approximately 19 to 26 different investment options during the Class Period. The SPD briefly describes the investment options available and cautions Plan Participants that they "should familiarize [themselves] with each choice's investment goals and level of risk before making [their] investment decisions." (*See* SPD, Forter Decl., Ex. 5 at 15.) The SPD explains that the BofA Common Stock Fund "invests primarily in [BofA] common stock" and "is neither a mutual fund nor a diversified or managed investment option." (*Id.* at 27.) The SPD also informs Plan Participants that, "[u]nder normal circumstances, the

fund invests primarily in the common stock of [BofA], and also invests in short-term investments." (*Id.*)

Furthermore, the SPD warns Plan Participants that "[t]he value of your account's investment in the fund will vary depending on the performance of [BofA] and its subsidiaries, the overall stock market and the performance and amount of short-term investments held by the fund." (*Id.* at 28.) In addition, under the heading: "Who may want to invest:" the SPD lists: "[s]omeone who wants to own part of the company he or she works for and a share in the gains or losses of its stock." (*Id.*) Finally, the SPD warns that "the 401(k) Plan allows [Plan Participants] to control the investment of [their] account[s]" and that the Benefits Committee "may not be held responsible for losses that are the direct result of [Plan Participants'] investment decisions." (*Id.*)

■ The SPD provided to Plan Participants also incorporates certain SEC filings, including the Annual Report on Form 10–K, the Quarterly Reports on Form 10–Q, and Current Reports on Form 8–K. (Compl. ¶ 326.) The Complaint alleges that "the actual statements included in these documents failed to set forth the true circumstances of the Company and thereby failed to provide the Plans' participants with an accurate picture of the health of [BofA]'s stock." (*Id.* ¶ 327.)

Specifically, the January 11, 2008 Form 8–K filing contained a statement from Lewis that "Countrywide presents a rare opportunity for [BofA] to add what we believe is the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier lender to consumers [because] ... home ownership is a fundamental pillar of the U.S. economy and over time it will be a key area of growth for [BofA]." (*Id.* ¶ 329.) Plaintiffs complain that other statements

regarding the benefits of BofA's acquisition of Countrywide were misleading. (*See id.* ¶¶ 329–30.)

'BofA's net income declined from $5.26 billion in the first quarter of 2007 to $1.21 billion in the first quarter of 2008. (*Id.* ¶ 331.) Notwithstanding this decline, "Lewis promised that [BofA] was in a 'strong position to withstand the jolts to the system'" in the April 21, 2008 Form 8–K filing. (*Id.*) That filing contained other statements reflecting a positive outlook for the company. (*Id.* ¶ 332 ("Our earnings power from our core business activities is strong and growing.... We are bringing innovative new products to market, taking market share and expanding customer relationships across the company.").)

In the second quarter of 2008, BofA reported net income that was 66% lower than its net income in the second quarter of 2007. (*Id.* ¶ 333.) "Despite these dismal numbers and the lack of any meaningful sign of improvement, Defendant Lewis assured the Plans' Participants that [BofA] was 'pleased with these solid results' and promised that the results demonstrated 'the advantages of our company's diversity and scale.'" (*Id.*)

BofA, through Lewis, continued to tout the benefits of the acquisition and BofA's relative position in the market, focusing on benefits of Countrywide's market share in the mortgage market. (*See id.* ¶ 334.) Plaintiffs allege that the statements painted a "misleadingly rosy picture of the Company, its condition and its prospects." (*Id.* ¶ 215.)

■ SEC filings and communications that included statements about the Company's financial condition did not become ERISA fiduciary communications simply because they were received by Plan Participants. A company acts in a fiduciary capacity under ERISA when it "*intention-*

*ally* connect[s] ... statements about [its] financial health to statements it ma[kes] about the future of benefits, so that its intended communications about the security of benefits [are] rendered materially misleading." *See Varity*, 516 U.S. at 505, 116 S.Ct. 1065 (emphasis in original); *see also In re Lehman*, 683 F.Supp.2d at 300 ("[E]merging caselaw makes clear that those who prepare SEC filings do not become ERISA fiduciaries through those acts."); *In re Citigroup*, 2009 WL 2762708, at *23; *In re Avon Prods.*, 2009 WL 848083, at *13 ("[C]reating and filing required corporate documents with the SEC and making quarterly announcements of performance are corporate acts and do not by themselves trigger ERISA scrutiny."). "[O]bviously, not all of [the Company's] business activities involved plan management or administration." *Varity*, 516 U.S. at 498, 116 S.Ct. 1065.

▇▇ Therefore, in determining whether general corporate and employer communications constitute fiduciary communications with plan beneficiaries, the court should consider "the factual context in which the statements were made," whether the activity was of a "plan-related nature," and whether the communications were made "by those who had plan-related authority to do so." *Id.* at 503, 116 S.Ct. 1065.

The Complaint does not plausibly allege facts that support the conclusory assertion that the statements, which were contained in corporate SEC filings, were made in an ERISA fiduciary capacity. There is no allegation that the statements were directed to the future of plan benefits, nor do plaintiffs plausibly allege that the statements were intentionally connected to communications about the future of plan benefits. The allegation that the statements about the company's financial condition contained information about the "likely future of the Plans' benefits, in particular the value and prudence of the 401(k) Plans' largest single investment, [BofA] stock" is insufficient because any holding otherwise would render all communications regarding a company's financial status as ERISA fiduciary communications. (*See* Compl. ¶ 135.)

The only allegation regarding a statement made "directly to employee-Plan participants" is an allegation that, "[o]n information and belief, throughout this time period, Mr. Lewis also directed statements directly to employee-Plan participants pumping up the Company and its prospects, and suggesting that the Company's stock was undervalued." (*Id.* ¶ 335.) Plaintiffs assert that because Lewis "knew that the employees' retirement savings were invested significantly in [BofA] stock in the Plans, his communications concerned this investment, and, thus, concerned Plan benefits," they "constituted acts of plan administration under ERISA." (*Id.* ¶ 503.) Under this rationale, however, any statement made by a CEO about the financial health of a company could be deemed a fiduciary communication. Such a rule would be contrary to the holding in *Varity*, where the Supreme Court indicated that an intentional connection between the financial condition of the company's stock value and the future of plan benefits is required.

▇▇ Furthermore, although the Complaint asserts claims against all of the Prudence Defendants for breach of the duty to disclose, as discussed *supra*, only the Benefits Committee is plausibly alleged to have had such a duty. The Complaint, construed most favorably, does not plausibly allege that the members of the Benefits Committee knew, or should have known, of negative information that it was obliged to disclose. There are no allegations that members of the Benefits Com-

mittee were involved in valuing BofA assets, preparing financial statements or evaluating BofA's financial position. *See In re Lehman,* 683 F.Supp.2d at 301. The Complaint's allegations fail to state a claim against defendants for breach of the duty to disclose.

### IV. *Duty to Monitor*

The text of ERISA does not explicitly impose a duty to monitor on plan fiduciaries. Although the Second Circuit has not spoken on this issue, several courts have held that there is a duty to monitor appointed fiduciaries under ERISA. *See, e.g., In re Polaroid ERISA Litig.,* 362 F.Supp.2d at 477 (collecting cases and concluding that an "appointing fiduciary's duty to monitor is well-established"). Where a claim rests on allegations that the appointed fiduciaries breached a duty of prudence, a failure to monitor claim fails where the plaintiffs do not successfully allege a breach of the duty of prudence. *See, Avaya,* 503 F.3d at 349 n. 15 ("Because we affirm the District Court's dismissal of [plaintiff's] duty of prudence claim, there is no basis to disturb the District Court's dismissal of [the] other claims."); *see also Fisher,* 703 F.Supp.2d at 389–90.

Assuming the existence of a duty to monitor, here, because the Complaint fails to allege a breach of a fiduciary duty, it fails to state a claim for breach of the duty to monitor. *See In re Lehman,* 683 F.Supp.2d at 303.

### V. *Co-fiduciary Liability*

Counts IV and VIII assert that all defendants are liable to plaintiffs under a theory of co-fiduciary liability. Under ERISA, a plan fiduciary is liable for a breach of a fiduciary responsibility of another with respect to the same plan: "(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) ... in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a). Because the Complaint does not plausibly allege a "breach of fiduciary responsibility of another," plaintiffs' claims based on a theory of co-fiduciary liability fail. *See In re Citigroup,* 2009 WL 2762708, at *27.

### VI. *Conclusion*

For the reasons explained above, the defendants' motion to dismiss the Complaint (Docket No. 119) is granted.

SO ORDERED.